## IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

SHIRLEEN GRANVILLE,    :
           :
     **Plaintiff,**  :
           :
 **v.**         :  **3:14-CV-00211**
           :  **(JUDGE MARIANI)**
AETNA LIFE INSURANCE CO.,  :
           :
     **Defendant.**  :

### MEMORANDUM OPINION

### I. INTRODUCTION AND PROCEDURAL HISTORY

Presently before the Court are cross-motions for summary judgment filed by Plaintiff

Shirleen Granville (Doc. 36) and by Defendant Aetna Life Insurance Company ("Aetna") (Doc.

38). Plaintiff filed this action under Section 1132(a) of the Employee Retirement Income

Security Act ("ERISA"), 29 U.S.C. §§ 1001 *et seq.*, seeking long-term disability benefits.

(Amended Compl., Doc.26, at ¶6). The parties have previously stipulated that the arbitrary and

capricious standard of review applies to Plaintiff's claims, (Stipulation of Agreement as to the

Standard of Review, Doc. 32), and the Court has accepted this stipulation by way of Order

(Doc. 33). For the reasons set forth below, the Court will grant Plaintiff's Motion for Summary

Judgment (Doc. 36) and deny Aetna's Motion for Summary Judgment (Doc. 38)

### II. STATEMENT OF MATERIAL FACTS

In accordance with Local Rule 56.1, the Plaintiff has submitted a statement of material

facts in support of her motion (Doc. 37) ("Plaintiff's SMF") as to which she submits there is no

genuine issue for trial. Aetna subsequently submitted its Response (Doc. 46) to Plaintiff's

SMF. In support of its Motion for Summary Judgment, Aetna has also submitted a Statement

of Undisputed Material Facts (Doc. 39) ("Aetna's SMF"). Plaintiff subsequently submitted an

Answer (Doc. 44) to Aetna's SMF. The following represents the facts agreed upon by the

parties, as well as the Court's supplementations drawn from the administrative record where

necessary. Except where expressly noted, the following facts of record are undisputed.

Penn Foster, Inc. employed Plaintiff as an "Enrollment Advisor,"[1] classified as a

sedentary physical demand occupation, beginning November 29, 2010. (Plaintiff's SMF, Doc.

---

[1] A job description contained in the Administrative Record describes an Enrollment Advisor position as follows: "The Enrollment Advisor I, under the general supervision of the project supervisor/coach, provides program and/or school information and, at the prospect's option, facilitates the enrollment process via telephone sales. Enrollment Advisor I represents Education Direct in a professional manner according to policies and procedures. Essential Duties and Responsibilities · Provide accurate and complete school/program information to the prospective student · Assist in facilitating the enrollment process via telephone sales · Develop/maintain in-depth working knowledge of Education Direct programs/courses; and related policies and procedures. · Follow established Education Direct policies and procedures · Handle all communications in a professional and courteous manner · Represent and sell the institution; provide prospective student with an integrated picture of ED On-Line, its courses, programs, policies and procedures, pricing, etc. · Drive prospective student to ED On-Line Web site and promote "experience it for yourself." · Identify academic needs (level) of prospective students for proper placement. · Promote Ed Traditional Print and On-Line to prospective student by matching solutions to individual student needs. · Communicate course status changes for students as necessary. · Assist new students in handling financial concerns in relation to registration for courses. · Contact students to determine decision status, answer questions, encourage enrollment or registration. · Follow/develop/maintain in-depth working knowledge of Education Direct programs/courses; and related policies and procedures. · Transfer student calls to appropriate department in a timely professional manner · Adhere to script to probe for information to qualify prospective students for enrollment · Must be able to perform in a multi-skilled environment · Must adhere to performance requirements as established by Contact Center Management · Performs other duties or responsibilities as required or requested[.]" (Doc. 48, Ex. 1 at 194). The requirements listed for the Enrollment Advisor I position are: "Education and/or experience · High School Diploma or completed GED · Contact Center, sales and related customer service experience a plus · Basic computer and keyboarding skills Skills and Abilities · Self-starter – capable of working with limited supervision · Good verbal and written communication skills · Good listening skills · Desire to work in distance education environment · Dependable – exemplary attendance record[.]" (*Id.*). In the Administrative Record, Plaintiff described her job as follows: "[t]ook class made calls to students wishing to enroll in online classes." (Work History and Education Questionnaire, Doc. 40, Ex. 7 at 48). Plaintiff also indicated that she worked eight hour days, sat for seven hours in a work day and used her right hand for repetitive movements. (*Id.*) As of January 5, 2012, Plaintiff described the duties she could not perform as "inputing [*sic*] info on computer." (*Id.* at 48-49).

37 at ¶1; Aetna's Response to Plaintiff's SMF, Doc. 46 at ¶1; Aetna's SMF, Doc. 39 at ¶1;

Plaintiff's Answer to Aetna's SMF, Doc. 44 at ¶1). Plaintiff was an eligible participant in the

Penn Foster Long Term Disability Group Plan ("the Plan"). (Doc. 39 at ¶2; Doc. 44 at ¶2).

Penn Foster was the Plan Administrator and funded the Plan through a Group Policy issued by

Aetna. (*Id*. at ¶3). Aetna is a fiduciary pursuant to § 503 of ERISA to whom Penn Foster

expressly delegates discretionary authority under the Plan, as follows:

> [Aetna] [is] a fiduciary with complete authority to review all denied claims for
> benefits under this Policy. . . . In exercising such fiduciary responsibility, [Aetna]
> shall have discretionary authority to determine whether and to what extent
> eligible employees and beneficiaries are entitled to benefits and to construe any
> disputed or doubtful terms under this Policy, the Certificate or any other
> document incorporated herein. [Aetna] shall be deemed to have properly
> exercised such authority unless [it] abuse[s] [its] discretion by acting arbitrarily
> and capriciously. [Aetna] [has] the right to adopt reasonable policies,
> procedures, rules, and interpretations of this Policy to promote orderly and
> efficient administration.

(*Id*. at ¶¶5-6).[2] The Test for disability under the Plan provides in relevant part:

> From the date that you first become disabled and until Monthly Benefits are
> payable for 24 months, you will be deemed to be disabled on any day if:
>
> - you are not able to perform the material duties of your own
>   occupation solely because of: disease or injury; and
> - your work earnings are 80% or less of your adjusted predisability
>   earnings.
>
> After the first 24 months that any Monthly Benefit is payable during a period of
> disability, you will be deemed to be disabled on any day if you are not able to
> work at any reasonable occupation solely because of:

---

[2] The quoted text is taken directly from the administrative record (Doc. 40, Ex. 1 at 74) as cited by
Aetna in its SMF (Doc. 39 at ¶6) due to what appear to be typographical errors in the quote provided by Aetna
in its SMF.

- disease; or
- injury.

(Doc. 39 at ¶8; Doc. 44 at ¶8; Doc. 37 at ¶¶4-5; Doc.46 at ¶¶4-5).  "Material Duties" is defined

by the Plan as duties that "are normally required for performance of your own occupation; and

cannot be reasonably: omitted or modified.  However to be at work in excess of 40 hours is not

a material duty."  (Doc. 39 at ¶12; Doc. 44 at ¶12).  "Own occupation" is defined by the Plan

as:

> the occupation you are routinely performing when your period of disability
> begins.  Your occupation will be viewed as it is normally performed in the
> national economy instead of how it is performed: for your specific employer; or at
> your location or work site; and without regard to your specific reporting
> relationship.

(*Id.* at ¶13).  A period of disability will end under various factors listed in the Plan, including:

- The date Aetna finds you are no longer disabled or the date you fail to
  furnish proof that you are disabled.

- The date you cease to be under the regular care of a physician.

- The date you refuse to receive treatment recommended by your
  attending physician that in Aetna's opinion would: cure; correct; or limit
  your disability.

(Doc. 39 at ¶10; Doc. 44 at ¶10).

Plaintiff's last day of work as an Enrollment Advisor was July 14, 2011.  (Doc. 39 at ¶15;

Doc. 44 at ¶15).  Plaintiff was approved for short term disability ("STD") benefits from July 15,

2011 through December 5, 2011; her STD benefits were then terminated and Plaintiff did not

appeal that decision.  (Doc. 39 at ¶16; Doc. 44 at ¶16).  Plaintiff submitted her LTD claim on

4

December 13, 2011. (Doc. 39 at ¶18; Doc. 44 at ¶18).[3] In a letter dated December 14, 2011, Aetna advised Plaintiff of the information and documentation needed to perfect her LTD claim and provided her with the necessary forms for her and her treating physician(s) to complete and return. (Doc. 39 at ¶19; Doc. 44 at ¶19). On December 28, 2011, Aetna advised Plaintiff by telephone and by letter that she must provide the required forms and information by January 26, 2012 and that a pre-existing condition investigation was also necessary; Aetna also provided Plaintiff with additional necessary forms to complete and return. (Doc. 39 at ¶20; Doc. 44 at ¶20). On January 27, 2012, Aetna denied LTD benefits to Plaintiff on the basis that it had not received the medical records and forms necessary to review eligibility for LTD. (Doc. 37 at ¶19; Doc. 46 at ¶19). The benefits were denied effective January 11, 2012. (Doc. 39 at ¶7; Doc. 44 at ¶7).

Throughout March, April, and early May 2012, Plaintiff provided Aetna with the forms it had requested, and Aetna began receiving medical records from some of Plaintiff's treating physicians. (Doc. 39 at ¶22; Doc. 44 at ¶22).[4] Aetna also obtained the medical records that had been obtained as part of Plaintiff's STD claim. (Id.). By the time Aetna again denied Plaintiff's LTD claim in a November 9, 2012 letter, Aetna had received the following information: completed LTD claim forms; a Capabilities and Limitations Worksheet from Dr.

---

[3] Since Plaintiff does not deny that she submitted the LTD claim on December 13, 2011, (see Doc. 44 at ¶18), as asserted by Aetna in its SMF, this fact is admitted.

[4] Plaintiff admits that she "provided information requested in support of her claim" and denies "as stated that [she] failed to provide information." (Doc. 44, at ¶22). Plaintiff's response to Aetna's SMF ¶22 does not constitute a proper denial and does not appear on its face to address whether or not Aetna received particular documents in a particular time range. Thus, the Court deems as admitted that Aetna received the forms and records as described above.

Shahroon Choudhry dated March 14, 2012; an Attending Physician Statement from Dr. Joseph

Stella also dated March 14, 2012; pharmacy records from May 1, 2010 through November 30,

2010 and January 1, 2011 through December 31, 2011; medical records from The Wright

Center Medical Group, PC date from August 2010 to January 5, 2011; medical records from

Community Medical Center for emergency department admissions in 2010; an office visit note

and confirmation of scheduled surgery from Dr. Shripathi Holla dated June 5, 2012; and a

letter from Dr. Joseph Stella dated August 8, 2012. (Doc. 37 at ¶22; Doc. 46 at ¶22; Doc. 40,

Ex. 6 at 23).

More specifically, on March 20, 2012 Plaintiff provided Aetna with an Attending

Physician Statement ("APS") from Joseph Stella, M.D. dated March 14, 2012, a Capabilities

and Limitations Worksheet ("CLW") from Shahroon Choudhry, M.D. dated March 14, 2012, a

Work History and Education Questionnaire, and other forms and releases authorizing Aetna to

obtain relevant medical and income information. (Doc. 39 at ¶23; Doc. 44 at ¶23). Dr. Stella's

APS diagnosed Plaintiff with cervicalgia, herniated disc, and spinal stenosis. (Doc. 39 at ¶24;

Doc. 44 at ¶24). Dr. Stella noted that Plaintiff was awaiting a neurosurgical evaluation but no

subsequent office visits were noted. Plaintiff's symptoms were identified as "neck pain, right

shoulder pain with numbness tingling and weakness of the right hand." (Doc. 39 at ¶25; Doc.

44 at ¶25). Dr. Stella identified MRI findings which he described as showing "severe stenosis"

with "C6/C7 disk herniation" and, based on those findings, opined that Plaintiff had no ability to

work and restricted her from pulling, pushing, and lifting weights greater than fifteen pounds.

(Doc. 39 at ¶26; Doc. 44 at ¶26). In the CLW, Dr. Choudhry found Plaintiff could occasionally

climb, crawl, kneel, bend, and twist and was capable of lifting one to five pounds. (Doc. 39 at ¶27; Doc. 44 at ¶27). He did not limit or comment on whether Plaintiff's head and neck movements were restricted despite the noted diagnosis of herniated disc in the neck, but he did restrict her right hand grasping and motor manipulation. (*Id.*). Dr. Holla, a neurosurgeon, wrote a letter to Dr. Choudhry, dated June 5, 2012, stating that Plaintiff had cervical radiculopathy of the C6 and C7 vertebrae on the right and that he offered surgery; this letter is contained in the administrative record. (Doc. 37 at ¶35; Doc. 46 at ¶35; Dr. Holla Letter, Doc. 40, Ex. 3 at 77). In an August 8, 2012 letter from Dr. Stella to Aetna, Dr. Stella stated that the Plaintiff "remains totally disabled due to her cervical disc disease and stenosis associated with a cervical radiculopathy." (Doc. 37 at ¶36; Dr. Stella Letter, Doc. 40, Ex. 6 at 31 and Ex. 3 at 19).[5] Dr. Stella further stated that "this has resulted in significant pain, numbness and weakness in her right upper extremity." (*Id.*).

On September 14, 2012, Plaintiff filed an appeal of Aetna's January 2012 denial of her LTD benefits. (Doc. 37 at ¶20; Doc. 46 at ¶20).[6] On October 24, 2012, Aetna advised Plaintiff that Aetna would review and consider her claim for LTD benefits. (Doc. 37 at ¶21; Doc. 46 at

---

[5] Aetna disputes Plaintiff's characterization of the August 8, 2012 letter from Dr. Stella as a "report." (Doc. 46 at ¶36). By way of further answer, Aetna seeks to explain the nature and the extent of the relationship between Dr. Stella and Plaintiff. (*Id.*). Aetna does not deny that it received such a letter or that it contained the quotes offered by Plaintiff in her SMF. Thus, the Court deems admitted those proffered facts.

[6] Plaintiff's response to Aetna's SMF ¶42 does not constitute a proper denial and does not appear to address the date of Plaintiff's appeal or the fact that Plaintiff did appeal. (Doc. 44 at ¶42). Thus, the court deems as admitted that Plaintiff filed an appeal of the January 2012 denial of her LTD benefits on or about September 14, 2012.

¶21; Doc. 39 at ¶43).[7]  In a November 9, 2012 letter, Aetna informed Plaintiff's Counsel of its

decision to deny Plaintiff's LTD benefits effective January 11, 2012.  (Doc. 39 at ¶44).[8]  Plaintiff

filed an appeal of Aetna's decision to terminate her LTD benefits on December 6, 2012.  (Doc.

39 at ¶50; Doc. 44 at ¶50).  Upon assignment, Aetna's appeal specialist contacted Plaintiff's

counsel who request additional time to submit documents.  The appeal was placed on hold

pending receipt of the documents until February 7, 2013.  (Doc. 39 at ¶52; Doc. 44 at ¶52).

Plaintiff did not provide any further documents in support of her appeal, but her counsel did

send Aetna a letter outlining his opinion that Aetna's claim determination was erroneous.

(Doc. 39 at ¶53; Doc. 44 at ¶53; Doc. 37 at ¶24; Doc.46 at ¶24).  Upon receipt of the letter

from Plaintiff's counsel, Aetna referred the appeal file out for an independent medical review

and peer-to-peer consultations by a reviewer in Occupational Medicine.  (Doc. 39 at ¶55; Doc.

44 at ¶55).  The independent reviewer for Aetna was Robert Swotinsky, M.D., Board-Certified

in Occupational Medicine.  (Doc. 39 at ¶56; Doc. 44 at ¶56;[9] Doc. 37 at ¶28; Doc.46 at ¶28).

Dr. Swotinsky found that Plaintiff was capable of full-time sedentary work and that there were

---

[7] Plaintiff responds, in the entirety, to Aetna's SMF ¶43 as follows: "Admitted that the Defendant reviewed the claim for LTD benefits."  (Doc. 44 at ¶43).  The Court construes this as an admission of the fact that Aetna advised Plaintiff that it would review and consider her claim in October 2012.  Plaintiff has not made clear what, if any, part of Aetna's SMF ¶43 she denies and on what basis; the Court will not speculate on the matter.

[8] Plaintiff admits that Aetna informed Plaintiff's Counsel of its decision but denies "[t]he decision to deny benefits" "as a conclusion of law."  (Doc. 44 at ¶44).  The Court deems Aetna's SMF ¶44 admitted, as Plaintiff appears to take issue with the legal correctness of Aetna's decision, not that a decision was made or that the decision was to deny benefits.

[9] Plaintiff denies Aetna's SMF ¶56 on the basis that Dr. Swotinsky's findings mentioned by Aetna were not supported by the record, but were rather arbitrary and capricious.  (Doc. 44 at ¶56).  The Court will deem the fact that Dr. Swotinksy is board-certified in occupational medicine as admitted by omission, as Plaintiff's response does not appear to be aimed at denying that particular fact of Aetna's SMF ¶56.

no records of medication-related impairments. (Doc. 39 at ¶56)[10]  Dr. Swotinsky characterized

the MRI results relied upon by Dr. Stella to support a finding of disability, *supra* at 7, as

showing a pinched nerve and further stated that a pinched nerve "does not by itself establish

an inability to do sedentary work, i.e. does not establish complete disability." (Doc. 39 at

¶59).[11]  Dr. Swotinsky further characterized exam findings in the record as "suggest[ing] some

weakness and/or loss of sensation in the right arm," but concluded that "this also does not

equate with complete disability." (Dr. Swotinsky's Physican Review, Doc. 40, Ex. 3 at 59).  As

of March 13, 2013 Aetna completed its appellate review of the decision to deny LTD benefits

and upheld that decision.[12]  (Doc. 39 at ¶62; Doc. 44 at ¶62; Doc. 37 at ¶25; Doc.46 at ¶25).

## III. STANDARD

### A. Standard of Review for Motions for Summary Judgment

Through summary adjudication, the court may dispose of those claims that do not

present a "genuine dispute as to any material fact." Fed. R. Civ. P. 56(a). "As to materiality, . .

. [o]nly disputes over facts that might affect the outcome of the suit under the governing law will

---

[10] Plaintiff denies Aetna's SMF ¶56 by asserting that Dr. Swotinsky's findings were not supported by the record and were instead arbitrary and capricious. (Doc. 44 at ¶56). The Court deems Aetna's SMF ¶56 admitted and reminds Plaintiff that admitting the fact that something occurred – in this case, that Dr. Swotinsky reached a certain conclusion – has no bearing on whether or not that conclusion was indeed correct or correctly reached.

[11] The Court deems Aetna's SMF ¶59 admitted and again reminds Plaintiff that admitting the fact that Dr. Swotinsky reached a certain conclusion has no bearing on whether or not that conclusion was indeed correct or correctly reached. (*See* Doc. 44 at ¶59).

[12] The Court is compelled to note the extremely small font in Aetna's letter. The Court hopes that Aetna is not sending correspondence to Plan participants in this virtually unreadable form. One of the classic indicia of unconscionability is fine print that is so fine as to be impossible to read; this is particularly so when an insurance giant such as Aetna is dealing with a layperson. Defendant's documents are fast approaching this mark of unconscionability. Furthermore, Defendant and Defendant's Counsel are on notice that the Court will reject their documents in the future should they be submitted in such an unreadable fashion.

properly preclude the entry of summary judgment." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248 (1986).

The party moving for summary judgment bears the burden of showing the absence of a genuine issue as to any material fact. *Celotex Corp. v. Catrett,* 477 U.S. 317, 323 (1986). Once such a showing has been made, the non-moving party must offer specific facts contradicting those averred by the movant to establish a genuine issue of material fact. *Lujan v. Nat'l Wildlife Fed'n,* 497 U.S. 871, 888 (1990). Therefore, the non-moving party may not oppose summary judgment simply on the basis of the pleadings, or on conclusory statements that a factual issue exists. *Anderson,* 477 U.S. at 248. "A party asserting that a fact cannot be or is genuinely disputed must support the assertion by citing to particular parts of materials in the record . . . or showing that the materials cited do not establish the absence or presence of a genuine dispute, or that an adverse party cannot produce admissible evidence to support the fact." Fed. R. Civ. P. 56(c)(1)(A)-(B). In evaluating whether summary judgment should be granted, "[t]he court need consider only the cited materials, but it may consider other materials in the record." Fed. R. Civ. P. 56(c)(3). "Inferences should be drawn in the light most favorable to the non-moving party, and where the non-moving party's evidence contradicts the movant's, then the non-movant's must be taken as true." *Big Apple BMW, Inc. v. BMW of N. Am., Inc.,* 974 F.2d 1358, 1363 (3d Cir. 1992), *cert. denied* 507 U.S. 912 (1993).

However, "facts must be viewed in the light most favorable to the nonmoving party only if there is a 'genuine' dispute as to those facts." *Scott v. Harris,* 550 U.S. 372, 380, 127 S. Ct.

1769, 1776, 167 L. Ed. 2d 686 (2007).  If a party has carried its burden under the summary

judgment rule,

> its opponent must do more than simply show that there is some metaphysical
> doubt as to the material facts.  Where the record taken as a whole could not lead
> a rational trier of fact to find for the nonmoving party, there is no genuine issue
> for trial.  The mere existence of some alleged factual dispute between the parties
> will not defeat an otherwise properly supported motion for summary judgment;
> the requirement is that there be no *genuine* issue of *material* fact.  When
> opposing parties tell two different stories, one of which is blatantly contradicted
> by the record, so that no reasonable jury could believe it, a court should not
> adopt that version of the facts for purposes of ruling on a motion for summary
> judgment.

*Id.* (internal quotations, citations, and alterations omitted).

In this case, the parties have filed cross-motions for summary judgment.  According to

the Third Circuit:

> Cross-motions are no more than a claim by each side that it alone is entitled to
> summary judgment, and the making of such inherently contradictory claims does
> not constitute an agreement that if one is rejected the other is necessarily
> justified or that the losing party waives judicial consideration and determination
> whether genuine issues of material fact exist.

*Lawrence v. City of Philadelphia*, 527 F.3d 299, 310 (3d Cir. 2008).  Each movant must show

that no genuine issue of material fact exists; if both parties fall to carry their respective

burdens, the court must deny the motions.  *See Facenda v. N.F.L. Films, Inc.*, 542 F.3d 1007,

1023 (3d Cir. 2008).  When reviewing each cross-motion, the court is still bound to view the

evidence in the light most favorable to the non-movant.  Fed. R. Civ. P. 56; *United States v.*

*Hall*, 730 F. Supp. 646, 648 (M.D. Pa. 1990).

## B. Standard of Review of Plan Administrator's Denial of ERISA Benefits

Parties have previously stipulated that the arbitrary and capricious standard of review –

rather than a *de novo* standard – applies to Plaintiff's claims that Aetna improperly denied

Plaintiff long term disability benefits. (*See* Stipulation of Agreement as to the Standard of

Review, Doc. 32). By way of Order (Doc. 33), the Court accepted the parties' stipulation.

A decision is arbitrary and capricious if "it is without reason, unsupported by substantial

evidence or erroneous as a matter of law." *Fleisher v. Standard Ins. Co.*, 679 F.3d 116, 121

(3d Cir. 2012). Under the arbitrary and capricious standard, "[c]ourts defer to an

administrator's findings of facts when they are supported by 'substantial evidence,' which [is]

'defined as such relevant evidence as a reasonable mind might accept as adequate to support

a conclusion.'" *Fleisher*, 679 F.3d at 121 (citation omitted). "The scope of this review is

narrow, and 'the court is not free to substitute its own judgment for that of the defendants in

determining eligibility for plan benefits.'" *Doroshaw v. Hartford Life & Accident Co.*, 574 F.3d

230, 234 (3d Cir. 2009) (quoting *Abnathya v. Hoffman–La Roche [Hoffmann], Inc.*, 2 F.3d 40,

45 (3d Cir. 1993), *abrogated on other grounds by Metro. Life Ins. Co. v. Glenn*, 554 U.S. 105,

112 (2008)). A defendant's decisions, then, will be upheld unless they are "clearly not

supported by the evidence in the record." *Michaels v. Equitable Life Assur. Soc'y*, 305 Fed.

App'x. 896, 901 (3d Cir. 2009) (citing *Smathers v. Multi–Tool, Inc.*, 298 F.3d 191, 199–200 (3d

Cir. 2002)). That is, so long as there were reasonable bases for a defendant's decisions, a

reviewing court will not disturb those decisions. *Id.*

12

## IV. ANALYSIS

To determine if a defendant's conclusion to deny benefits was arbitrary and capricious,

courts consider (1) "various procedural factors underlying the administrator's decision-making

process," and (2) "structural concerns regarding how the particular ERISA plan was funded."

*Miller v. Am. Airlines, Inc.*, 632 F.3d 837, 845 (3d Cir. 2011). "[T]the procedural inquiry focuses

on how the administrator treated the particular claimant." *Id.* (citing *Post v. Hartford Ins. Co.*,

501 F.3d 154, 162 (3d Cir. 2007)).

> Examples of procedural anomalies that suggest arbitrariness include: (1)
> reversing a decision to award benefits without new medical evidence to support
> the change in position, (2) relying on the opinions of non-treating over treating
> physicians without reason, (3) conducting self-serving paper reviews of medical
> files, (4) failing to address all relevant diagnoses before terminating benefits, (5)
> relying on favorable parts while discarding unfavorable parts in a medical report,
> and (6) denying benefits based on inadequate information and lax investigatory
> procedures.

*Connelly v. Reliance Standard Life Ins. Co.*, No. CIV.A. 13-5934, 2014 WL 2452217, at *4

(E.D. Pa. June 2, 2014).

Based on the Court's review, the administrative record before Aetna during the

pendency of Plaintiff's administrative LTD claim and her administrative appeal supported her

claim for benefits; Aetna's denial is arbitrary and capricious because it is "without reason" and

unsupported by substantial evidence under *Fleischer. Fleisher*, 679 F.3d at 121.  The Court

finds that there is objective medical evidence of Plaintiff's disability under the Plan's applicable

"own occupation" standard and that Aetna has failed to point to any record evidence to the

contrary, let alone substantial evidence.

Plaintiff began her treating relationship at the office of Doctors Stella and Choudhry on

July 20, 2011 for pain that started after she was installing an air conditioner. (Office Note, Doc.

40, Ex. 5 at 24). On August 9, 2011, Plaintiff underwent an MRI showing, *inter alia,* "multilevel

degenerative disk changes at the C4/C5 through C7/T1 [] levels, most severe at C6/C7 with a

focal right posterior disk protrusion with migration of the nucleus pulposus with resultant

moderate to severe narrowing of the right neural foramina at this level." (Doc. 40, Ex. 4 at 53-

54). Also on August 9, 2011, Plaintiff had an EMG study done with "normal" results. (Doc. 40,

Ex. 6 at 7). The record reveals that Plaintiff continued to receive care at the office of Doctors

Stella and Choudhry on several other dates in the summer and fall of 2011, (*see, e.g.,* Doc. 40,

Ex. 4 at 63, 66 and Ex. 5 at 31, 39, 47). As is undisputed, *see supra* at 6-7, Dr. Choudhry

submitted to Aetna a CLW dated March 14, 2012, diagnosing her with a herniated disc and

restricting her right hand grasping and motor manipulation. On the same date, Dr. Stella

submitted an APS in which he opined that she was completely disabled, based on an MRI

study showing C6/C7 disc herniation and "severe stenosis."[13] These are professional medical

opinions based on objective medical evidence, namely the August 2011 MRI results, and

repeated office visits in which Dr. Choudhry, supervised by Dr. Stella, in which Plaintiff

---

[13] The Court declines Aetna's apparent invitation to discount the strength of Dr. Stella's March 14, 2012 APS and August 8, 2012 letter because Dr. Stella is consistently noted in the medical records from Plaintiff's office visits to his practice as only having reviewed the work of his resident, Dr. Choudhry, rather than examining the Plaintiff himself. (*See, e.g.,* Aetna's Brief in Opposition to Plaintiff's Motion for Summary Judgment, Doc. 47 at 8). The Court finds unremarkable the facts that (1) Dr. Stella's supervision of a resident consisted of reviewing the resident's notes and discussing the management of the patient with the resident; (2) Dr. Stella, Dr. Choudhry's attending physician, completed and signed Aetna's Attending Physician Statement; and (3) Dr. Stella, having been consistently involved in Dr. Choudhry's treatment of Plaintiff, continued to have a professional medical opinion about Plaintiff after Dr. Choudhry's term as a resident at the practice had ended.

consistently reported pain. (*See, e.g.*, Office Notes, Doc. 40, Ex. 4 at 63, 66 and Ex. 5 at 24, 31, 39, 47). Drs. Choudhry and Stella consistently treated her for pain and made outside referrals to specialists. (*See, e.g.*, Neurosurgery Referral, Doc. 40, Ex. 6 at 3). There is no contrary medical evidence in the record, as the Court will discuss below.

Aetna appears to place great stock in Dr. Swotinsky's paper review and relies on it to undermine the office notes and opinions coming from Drs. Choudhry and Stella. However, the Court finds his review to have little application to the question before Aetna: was Plaintiff disabled from her own occupation? Dr. Swotinsky concludes that there is insufficient evidence to support the treating physician's conclusions of "complete disability." (*See supra* at 9). But Dr. Swotinsky's task was to evaluate Plaintiff's disability status as of January 2012, when the test for disability was measured by her *own occupation*. (*See supra* at 3-4). Finding her capable of sedentary work and not completely disabled does not speak to this less stringent standard, even where Plaintiff's own occupation was classified as a sedentary demand level, (*see supra* at 2; Doc. 39 at ¶34; Doc. 44 at ¶34).

Relatedly, the Court is wary of Aetna's failure to conduct an independent medical examination in this case, an examination which it had a right to require under the terms of the Plan, (*see* Plan Documents, Doc. 40, Ex. 1 at 5). While it is true that Defendant was not required by the terms of the Plan to conduct an independent medical examination of Plaintiff, the Court will consider the failure to pursue such an examination in evaluating Dr. Swotinsky's paper review as compared to the contrary disability findings of Drs. Choudhry and Dr. Stella. (*See, e.g.*, *Morgan v. The Prudential Insu. Co. of Am.*, 755 F. Supp. 2d 639, 647 (E.D. Pa.

15

Nov. 18, 2010) ("[W]here the insured's treating physician's disability opinion is unequivocal and based on a long term physician-patient relationship, reliance on a non-examining physician's opinion premised on a records review alone is suspect and suggests that the insurer is looking for a reason to deny benefits.") (citing *Kaufmann v. Metro. Life Ins. Co.*, 658 F. Supp. 2d 643, 650 (E.D. Pa. Sept. 24, 2009)).  Here, Dr. Choudhry, as supervised by Dr. Stella, met with and examined Plaintiff multiple times over a period of months and unequivocally found her disabled.  Dr. Choudhry had the opportunity to evaluate the objective evidence of Plaintiff's MRI results in the context of her subjective reports, and his own examinations of and interactions with her.  To the extent that Aetna argues that there is insufficient clinical evidence to support Plaintiff's claim for disability, the Court again emphasizes that Plaintiff has come forward with some objective evidence of her disability, as well as professional medical opinions as to her disability based on a treating relationship and that Aetna made little effort to further investigate.  Denying benefits based on inadequate information and lax investigatory procedures is a procedural factor relevant to the arbitrary and capricious standard.

The Court is also wary of Dr. Swotinsky and Aetna's apparent failure to "consider the claimant's specific job requirements under an 'own occupation' policy, another procedural factor which "call[s] into question the fairness of the process and suggest[s] arbitrariness." *Harper v. Aetna Life Ins. Co.*, No. 10-1459, 2011 WL 1196860, at *2 (E.D. Pa. March 31, 2011) (citing *Miller*, 632 F.3d at 855).  Dr. Swotinksy opined that "[Plaintiff's] file supports ability of performed sedentary activity.  Impairments that preclude even sedentary work must . . . be demonstrated by objective evidence of significant dysfunction." (Doc. 40, Ex. 3 at 59).  Aetna

also conducted a cursory vocational assessment of Plaintiff's "own occupation," (Doc. 39 at

¶34; Doc. 44 at ¶34, Doc. 40, Ex. 1 at 197), finding:

> This position is in a call center providing information and sales re on-line
> education programs. Duties are similar to DOT #259.257-010 Sales
> Representative, Education Courses. However, that DOT is LIGHT as it
> contemplates meeting with students. Therefore, [Aetna chose] DOT #299.357-
> 014 Telephone Solicitor SEDENTARY SVP 3 as comparable occupation as it
> captures the call center environment and sales components.

(Doc. 40, Ex. 1 at 197). But to extent that Dr. Swotinksy's review and the vocational

assessment are based on the flowery description of Plaintiff's job, *see supra* Footnote 1, this

review and assessment lack a concrete analysis of Plaintiff's impairments as they relate to the

actual duties of her job. For instance, Plaintiff described her main difficulty in potentially

returning to her job as inputting information into the computer, *supra* Footnote 1, a concrete

complaint that Aetna seems to have failed to engage with. While the Court recognizes that

"own occupation" refers to Plaintiff's occupation in the context of the national economy, rather

than her specific job at Penn Foster itself, there is not substantial evidence in the record to

support an understanding of what exactly Plaintiff's occupation *is* such that Aetna could

accurately reach a determination as to disability under the "own occupation" standard to which

Plaintiff was subject.

　　"Procedural irregularities in the review process cast doubt on the administrator's

impartiality." *Harper v. Aetna Life Ins. Co.*, No. 10-1459, 2011 WL 1196860, at *2 (E.D. Pa.

March 31, 2011) (citing *Miller*, 632 F.3d at 845). Here, Aetna has engaged in multiple

procedural irregularities, including conducting a self-serving paper review of the medical files

based on the incorrect disability standard, relatedly relying on the opinion of a non-treating, non-examining physician without reason, and denying benefits based on inadequate information and lax investigatory procedures, as evidenced by Aetna's decision not to pursue an independent medical examination and its failure to analyze the specific requirements of Plaintiff's own occupation.   These irregularities compounded each other throughout the review and appeal of Plaintiff's administrative claim and lead this Court to find that Aetna acted arbitrarily and capriciously in denying Plaintiff's LTD benefits.  Plaintiff's claim is based on objective evidence, specifically multilevel degenerative disc changes at the C4/C5 with severe changes at C6/C7 accompanied by a right posterior disc protrusion with moderate to severe narrowing of the right neural foramina at that level and severe spinal stenosis.  Nothing in Aetna's review indicates in any way that it challenges the existence of these significant limitations which the Plaintiff has been objectively shown to possess.  Its decision to deny her benefits on the strength of a perfunctory paper review, coupled with the absence of any effort on the part of Aetna to undertake any other action to support its decision, requires that its denial of Plaintiff's LTD benefits claim be deemed arbitrary and capricious.[14]

---

[14] To the extent that Aetna argues that it did not act in an arbitrary and capricious manner in denying Plaintiff's LTD benefits because it was unable to complete its required pre-existing condition investigation, (*see* November 9, 2012 Letter Denying Benefits, Doc. 40, Ex. 6 at 24), the Court is unpersuaded. The Court has carefully reviewed Aetna's denial letter and finds it to be based in the main on its claim that Plaintiff failed to offer sufficient clinical evidence of disability. Thus, this opinion focuses on that argument. Aetna's reliance on its pre-existing condition argument as an alternative reason for denying benefits is a specious procedural move that is unjustified based on the record. For instance, Aetna claims that Plaintiff failed to provide "all records from Dr. Shahroon Choudhry FP/Dr[.] Joseph Stella FP from May 1, 2010 through November 28, 2010, despite the fact that Plaintiff saw Dr. Choudhry "to establish care" and as a "new patient" on July 20, 2011. (Office Note, Doc. 40, Ex. 5 at 24, 29). Furthermore, Aetna does not cite the pre-existing condition investigation as a reason for upholding its decision during its review on administrative appeal. (*See* March 13, 2013 Letter Upholding Denial, Doc. 40, Ex. 3 at 40).

Because Aetna's decision to deny benefits was founded on the "own occupation" standard applicable for the initial twenty-four month period of LTD benefits, there remains the additional issue as to whether Plaintiff would qualify for benefits under the definition of disability that becomes applicable at the end of the initial twenty four months. That definition deems a participant "disabled on any day if [she] [is] not able to work at any reasonable occupation solely because of disease; or injury." (Plan Documents, Doc. 40, Ex. 1 at 4). Because no analysis was made of Plaintiff's claim under that standard – for the reason that it had not yet become applicable – this opinion does not address Plaintiff's eligibility for LTD benefits under the "any occupation" standard applicable after the initial twenty-four month period of LTD benefits. Had the Plaintiff been granted benefits, as she should have been, as of the effective date of January 11, 2012 based on the "own occupation" standard, the twenty-four month period would have expired on January 10, 2014. Those benefits are due and payable under this opinion. However, Plaintiff's entitlement, if any, after January 10, 2014 under the "any occupation" standard is not before this Court. Should Plaintiff within twenty eight days of the date of the Court's Order accompanying this Memorandum notify Aetna in writing that she continues to be disabled and wishes to have her claim of continued disability evaluated by Aetna for the payment of further benefits, this matter is remanded to Aetna for the fulfillment of its evaluation responsibilities under the terms of the disability policy at issue.

## V. Conclusion

Based on the foregoing, Plaintiff's Motion for Summary Judgment (Doc. 36) will be granted and Aetna's Motion for Summary Judgment (Doc. 38) will be denied.

A separate Order follows.

Robert D. Mariani
United States District Judge